SZAFERMAN, LAKIND,
BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08648
By:  Robert L. Lakind
        Arnold C. Lakind
Telephone: (609) 275-0400
Fax: (609) 275-4511

LEVY KONIGSBERG LLP
800 Third Avenue, 11th Floor
New York, New York 10022
By:  Moshe Maimon
Telephone:  (212) 605-6200
Fax:  (212) 605-6290

ZWERLING, SCHACHTER &
ZWERLING, LLP
41 Madison Avenue
New York, New York 10010
By: Robin F. Zwerling
        Jeffrey C. Zwerling
        Susan Salvetti
        Andrew W. Robertson
Telephone: (212) 223-3900
Fax: (212) 371-5969

*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER L. KASILAG, LOUIS MELLINGER, JUDITH M. MENENDEZ, JACQUELINE M. ROBINSON, LINDA A. RUSSELL, DENNIS RUSSELL, AND DARIN DUDEK, ON BEHALF OF AND FOR THE BENEFIT OF THE HARTFORD HEALTHCARE FUND, THE HARTFORD CONSERVATIVE ALLOCATION FUND, THE HARTFORD GROWTH OPPORTUNITIES FUND, THE HARTFORD INFLATION PLUS FUND, THE HARTFORD BALANCED FUND, THE HARTFORD CAPITAL APPRECIATION FUND, THE HARTFORD FLOATING RATE FUND, AND THE HARTFORD SMALL COMPANY FUND, | Case Number: _____ [Seeking Consolidation] |
| Plaintiffs, | |
| vs. | **COMPLAINT** |
| HARTFORD FUNDS MANAGEMENT COMPANY, LLC, | DEMAND FOR JURY TRIAL |
| Defendant. | |

## COMPLAINT

Plaintiff JENNIFER L. KASILAG ("Kasilag"), whose street address is 35 Oklahoma Trail, Hopatcong, New Jersey 07843, Plaintiff LOUIS MELLINGER ("Mellinger"), whose street address is 28 Mockingbird, Hackettstown, New Jersey 07840, Plaintiff JUDITH M. MENENDEZ ("Menendez"), whose street address is 93 Eyland Avenue, Succasunna, New Jersey 07876, Plaintiff JACQUELINE M. ROBINSON ("Robinson"), whose street address is 45 Livingston Road, Morristown, New Jersey 07960, Plaintiff LINDA A. RUSSELL ("L. Russell"), whose street address is 52 Birch Ridge Road, Blairstown, New Jersey 07825, Plaintiff DENNIS RUSSELL, ("D. Russell") whose street address is 52 Birch Ridge Road, Blairstown, New Jersey 07825, and Plaintiff DARIN DUDEK ("Dudek") whose street address is 1132 Polo Drive, South Lyon, Michigan 48178  (collectively, "Plaintiffs") bring this action on behalf of and for the benefit of: the Hartford Healthcare Fund (f/k/a the Hartford Global Health Fund), the Hartford Conservative Allocation Fund, the Hartford Growth Opportunities Fund, the Hartford Inflation Plus Fund, the Hartford Balanced Fund (f/k/a the Hartford Advisers Fund), the Hartford Capital Appreciation Fund, the Hartford Floating Rate Fund, and the Hartford Small Company Fund (collectively, the "Hartford Funds"), and sue Hartford Funds Management Company, LLC ("HFMC" or "Defendant"), an indirect wholly-owned subsidiary of Hartford Financial Services Group, Inc. ("HIG"), a company having shares listed on the New York Stock Exchange.

## I.    NATURE OF THE ACTION

1.    This action is brought by the Plaintiffs on behalf of and for the benefit of the Hartford Funds, pursuant to Section 36(b) of the Investment Company Act of 1940 ("ICA"), as amended 15 U.S.C. § 80a-35(b) (hereinafter "Section 36(b)" or "§ 36(b)").

1

2.    ICA § 36(b), 15 U.S.C. § 80a-35(b), provides that an investment manager to a mutual fund acts in a fiduciary capacity when it charges a mutual fund fees for its advisory services, and thus authorizes a security holder of a mutual fund to sue the adviser to such fund to recover damages caused by a breach of the adviser's fiduciary duty, including any excessive compensation received by the adviser.

3.    The Hartford Mutual Funds, Inc. ("HMF") is an open-end management investment company registered under the ICA, 15 U.S.C. § 80a-1, *et seq*., comprised of various mutual funds, including the Hartford Healthcare Fund, the Hartford Conservative Allocation Fund, the Hartford Balanced Fund, the Hartford Inflation Plus Fund, the Hartford Capital Appreciation Fund, the Hartford Floating Rate Fund, and the Hartford Small Company Fund, each of which is a separate investment portfolio or mutual fund.

4.    The Hartford Mutual Funds II, Inc. ("HMFII") is an open-end management investment company registered under the ICA, 15 U.S.C. § 80a-1, *et seq*., comprised of various mutual funds, including the Hartford Growth Opportunities Fund, each of which is a separate investment portfolio or mutual fund.

5.    Defendant serves as the investment manager/adviser to each of the Hartford Funds and is sued in this Complaint based on its misconduct related to its wrongful receipt of fee income in violation of Section 36(b) of the ICA.

6.    Defendant derived and continues to derive revenues in the form of fees for what it claims to be the provision of investment management services to the Hartford Funds.   In particular, Defendant receives fee compensation from each of the Hartford Funds and earns investment management fee revenues by allegedly providing investment advisory services pursuant to investment management agreements with each Hartford Fund.   Defendant is sued in

this Complaint based on its misconduct related to its wrongful receipt of fee income in violation of Section 36(b) of the ICA.

7.     The Plaintiffs, who own shares of the Hartford Funds, allege that the investment management fees charged to each of the Hartford Funds by Defendant, the funds' investment manager, breached HFMC's § 36(b) fiduciary duty to the Hartford Funds with respect to such compensation as demonstrated by, *inter alia*: (a) the nature and quality of services provided to the Hartford Funds and their security holders in exchange for the investment management fees, including the fact that Defendant subcontracts out most of the management services, yet still charges, in all cases, investment management fees that exceed the fee paid to the Hartford Funds' sub-advisers; (b) the failure of the Hartford Funds' Boards of Directors to exercise the requisite level of care and conscientiousness in approving the investment management agreements and the fees paid pursuant thereto; (c) the failure of Defendant to provide the Hartford Funds' Boards of Directors with all information reasonably necessary to evaluate the terms of the investment management agreements with respect to each Hartford Fund; (d) the fees other mutual fund advisers charge for similar services to similar mutual funds; (f) the failure of Defendant to adequately pass economies-of-scale savings on to the Hartford Funds and their security holders, and the retention of those economies-of-scale savings by Defendant; and (g) Defendant's costs and high profitability associated with providing investment management services to the Hartford Funds.

8.     Plaintiffs bring this action pursuant to ICA § 36(b), 15 U.S.C. § 80a-35(b), on behalf of and for the benefit of all of the Hartford Funds.

9.     Plaintiffs, on behalf of the Hartford Funds, seek the actual damages resulting from the breach of fiduciary duty by Defendant, including the amount of excessive compensation and

payments received from the Hartford Funds and lost profits or investment returns on those amounts, pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3), and/or rescission of the contracts that resulted in these breaches pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b).

10.    Plaintiffs seek recovery for all periods permitted by law and allege that the damages claimed herein are ongoing and continuous.

11.    The allegations in this Complaint are based, in large part, on publicly-available information, including, but not limited to, information contained in the public filings with the Securities Exchange Commission ("SEC" or "Commission") of HMF and HMFII ("Hartford Disclosure Materials"), and on information and belief after a reasonable investigation.    On information and belief, the statements that are contained in any SEC filing represent Defendant's conduct throughout the entire time period applicable to Plaintiffs' claims.

## II.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

13.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 80a-43 as Defendant inhabits or transacts business in this district, a substantial part of the events or omissions that give rise to Plaintiffs' claims occurred in this district, and Defendant may be found in this district.

14.    No pre-suit demand on the Boards of Directors of The Hartford Mutual Funds, Inc. and The Hartford Mutual Funds II, Inc. (collectively the "Boards")[1], which are the Boards overseeing the Hartford Funds, is required, as the demand requirement of Rule 23.1 of the

---

[1] Each director serves as a director for The Hartford Mutual Funds, Inc., The Hartford Mutual Funds II, Inc., Hartford Series Fund, Inc., and Hartford HLS Series Fund II, Inc., and as a trustee for The Hartford Alternative Strategies Fund, which, as of April 30, 2013, collectively consist of 90 funds. The mutual funds at issue in this Complaint are contained in the Hartford Mutual Funds, Inc. and the Hartford Mutual Funds II, Inc.

Federal Rules of Civil Procedure does not apply to actions or counts brought under § 36(b) of the ICA.

15.   All conditions precedent to suit have been performed, or have been satisfied or waived.

## III.   PARTIES

### A.   Plaintiffs

16.   Plaintiff Mellinger owns shares of and is therefore a security holder of the Hartford Growth Opportunities Fund and the Hartford Inflation Plus Fund.

17.   Plaintiff Menendez owns shares of and is therefore a security holder of the Hartford Balanced Fund.

18.   Plaintiff L. Russell owns shares of and is therefore a security holder of the Hartford Balanced Fund, the Hartford Growth Opportunities Fund, and the Hartford Capital Appreciation Fund.

19.   Plaintiff D. Russell owns shares of and is therefore a security holder of the Hartford Capital Appreciation Fund.

20.   Plaintiff Robinson owns shares of and is therefore a security holder in the Hartford Balanced Fund and the Hartford Inflation Plus Fund.

21.   Plaintiff Kasilag owns shares of and therefore is a security holder of the Hartford Conservative Allocation Fund and the Hartford Healthcare Fund.

22.   Plaintiff Dudek owns shares of and therefore is a security holder of the Hartford Floating Rate Fund and the Hartford Small Company Fund.

### B.       Defendant

23.   Defendant HFMC is a limited liability company organized under Delaware law with its principal place of business in Radnor, Pennsylvania.

24.   HFMC is an indirect wholly-owned subsidiary of non-party HIG.[2]

25.   HFMC is registered as an investment adviser under the Investment Advisers Act of 1940 ("IAA").

26.   HFMC serves as investment adviser or investment manager to the Hartford Funds pursuant to Investment Management Agreements between HFMC and HMF and HMFII, on behalf of each of the Hartford Funds, dated January 1, 2013 (together, the "IMAs").

27.   Prior to January 1, 2013, one of HFMC's affiliates, Hartford Investment Financial Services, LLC ("HIFSCO"), served as investment adviser or investment manager to the Hartford Funds.

28.   According to the Hartford Disclosure Materials, "[t]he replacement of HIFSCO with HFMC did not result in any change to (i) the contractual terms of, including the fees payable under, the [Hartford Funds'] investment management agreements; or (ii) the day-to-day management of the [Funds]."

---

[2] HIG is an insurance and financial services company with shares listed on the New York Stock Exchange.  HIG, through its wholly-owned subsidiaries, provides a variety of investment management, administrative, and operational services for a large number of investment companies or mutual funds (the "Hartford Funds Complex") and managed accounts.  Plaintiffs refer to HIG, together with its subsidiaries and/or affiliates that perform a variety of investment management, administrative, and operational services to mutual funds and managed accounts, collectively as "Hartford," which is also how Hartford refers to itself in its public filings.

## IV.    BACKGROUND INFORMATION ABOUT THE INVESTMENT MANAGEMENT INDUSTRY AND THE PURPOSE OF SECTION 36(b)

29.    A mutual fund is "typically created and managed by a pre-existing organization known as an investment adviser" that "generally supervises the daily operation of the fund and often selects affiliated persons to serve on the [fund's] board of directors." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984).

30.    Congress recognized as early as 1935 that because "a typical [mutual] fund is organized by its investment adviser which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter, sever its relationship with the advisor." S. Rep. No. 91-184, p. 5 (1969). Therefore, "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *Id.*

31.    As a result, in 1940, Congress enacted the ICA recognizing that:

> The national public interest and the interest of investors are adversely affected . . . when investment companies are organized, operated [and] managed . . . in the interest of . . . investment advisers . . . rather than in the interest of [shareholders] . . . or when the investment companies . . . are not subjected to adequate independent scrutiny.

ICA § 1(b)(2), 15 U.S.C. § 80a-1(b)(1994)

32.    Accordingly, the ICA was designed to regulate and curb "abuses inherent in the structure of [the mutual fund industry]," *Jones v. Harris Associates L.P.*, 130 S. Ct. 1418, 1422 (2010) (quoting *Daily Income Fund*, 464 U.S. at 536), and to create standards of care applicable to investment advisers and their affiliates, such as Defendant.

33.    By the 1960s, it had become clear to Congress that investment advisers to equity mutual funds were charging those funds excessive fees, particularly by not taking economies of scale into account.

34.   Thus, ICA § 36(b), 15 U.S.C. § 80a-35(b), was added to the ICA in 1970, primarily to remedy excessive fees charged by mutual funds such as those owned by Plaintiffs.   This provision created a federal cause of action for breach of fiduciary duty by investment advisers. Section 36(b) – which imposes a fiduciary duty on mutual fund investment managers (and their affiliates) with respect to the receipt of compensation for services – states in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.  **An action may be brought under this subsection . . . by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor . . . for breach of fiduciary duty in respect to such compensation** or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

ICA § 36(b), 15 U.S.C. § 80a-35(b) (emphasis added).

35.   The conflicts in the inherent structure of mutual funds, including those at issue here, exemplify the concern raised in the preamble to the ICA that "investment companies are organized, operated and managed in the interest of investment advisers, rather than in the interest of shareholders."   Indeed, the goal of ICA § 36(b), 15 U.S.C. § 80a-35(b), is to empower security holders to independently police whether investment advisers have fulfilled their fiduciary obligations.

36.   "The relationship between investment advisers and mutual funds is fraught with potential conflicts of interest," *Burks v. Lasker*, 441 U.S. 471, 481 (1979), and is "potentially incestuous." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929 (2d Cir. 1982).

37.   Through   ICA § 36(b), 15 U.S.C. § 80a-35(b), Congress gave security holders a "unique right," *Daily Income Fund*, 464 U.S. at 536, empowering them with the ability to be an

independent check on an adviser's fulfillment of its fiduciary duties and receipt of excessive fees.  By enacting ICA § 36(b), 15 U.S.C. § 80a-35(b), Congress provided security holders with a means to redress breaches of the adviser's fiduciary duty to the funds it manages while leaving the "ultimate responsibility for the decision in determining whether the fiduciary duty has been breached [] with the court."  S. Rep. 91-184, p. 6.

## V.   FACTORS GENERALLY RELEVANT TO A SECTION 36(b) CLAIM

38.   ICA § 36(b), 15 U.S.C. § 80a-35(b), itself does not set forth a list of factors to be considered in determining whether an investment adviser, such as HFMC, has breached its fiduciary duty with respect to its receipt of compensation for services paid by a mutual fund such as any of the Hartford Funds.

39.   The test for determining whether fee compensation paid to HFMC violates ICA § 36(b), 15 U.S.C. § 80a-35(b), is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's length in light of all the surrounding circumstances." *Gartenberg*, 694 F.2d at 928.

40.   If an adviser charges a fee that is "so disproportionately large that it bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining" (*see Jones*, 130 S.Ct. at 1418 (quoting *Gartenberg*)), the adviser has violated ICA § 36(b), 15 U.S.C. § 80a-35(b).

41.   In the context of § 36(b) litigation, courts have historically considered, *inter alia*, the following factors ("*Gartenberg* Factors"):

- the nature and quality of services being paid for by the fund and its investors;

- whether the directors exercised a sufficient level of care and conscientiousness in approving the investment advisory or management agreements;

- what fees are charged by the adviser to its other non-mutual fund customers, if any;

- what fees other mutual fund complexes or funds within the same fund family charge for similar services to similar mutual funds;

- whether economies of scale were passed to the funds and their investors or kept by the investment adviser; and

- the costs of providing those services and the profitability of providing the services.

42.   As set forth below, an examination of the *Gartenberg* Factors demonstrates that the fees charged to the Hartford Funds and their investors breached and continue to breach Defendant's fiduciary duty to the Hartford Funds.   Indeed, Defendant's advisory fees were so disproportionately large that they bore no reasonable relationship to the services rendered, and could not have been the product of arm's-length bargaining, and were thus unfair to Plaintiffs and the other security holders of the Hartford Funds.

**A.     THE NATURE AND QUALITY OF THE INVESTMENT MANAGEMENT SERVICES PERFORMED BY DEFENDANT DOES NOT JUSTIFY DEFENDANT'S FEE**

43.   Each of the Hartford Funds pays a monthly management fee to Defendant, based on a stated percentage of the Fund's average daily net asset value, for its investment management services.   As such, the investment management fees are not based on the services actually rendered or Defendant's actual costs in providing services to the Hartford Funds.

44.   Rather than providing the majority of the investment management services directly to the Funds, HFMC subcontracts with others to provide the services.

45.   HFMC has sub-contracted its investment management duties with respect to each of the Hartford Funds to Wellington Management Company, LLP ("Wellington"), pursuant to

Investment Sub-Advisory Agreements between HFMC and Wellington (the "Investment Sub-Advisory Agreements").

46.   HFMC's fee schedule varies for each of the Hartford Funds.  Each Fund pays a fee to HFMC which then subcontracts with Wellington at a fraction of HFMC's fee.

47.   The table below sets forth the investment management fees which were paid to, and retained by, HFMC (or HIFSCO, HFMC's affiliate and predecessor as the Hartford Fund's investment adviser, for the period from November 1, 2012 through January 1, 2013) from each of the Hartford Funds, and the subadvisory fees paid to Wellington for the fiscal year ended October 31, 2013.

### ADVISORY FEES RETAINED AFTER PAYMENT TO HARTFORD FUNDS' SUB-ADVISERS FOR FISCAL YEAR ENDED OCTOBER 31, 2013

| Hartford Fund | Net Paid Adviser (After Deducting Fees Paid to Each Fund's Sub-Adviser) | Net Paid Sub-Adviser | Difference | % By Which Adviser's Fee Is Greater Than Sub-Adviser's Fee |
|---|---|---|---|---|
| Hartford Balanced Fund | $3,194,958 | $954,923 | $2,240,035 | 235% |
| Hartford Growth Opportunities Fund | $9,900,792 | $6,059,899 | $3,840,893 | 63% |
| Hartford Inflation Plus Fund | $7,841,975 | $1,313,391 | $6,528,584 | 497% |
| Hartford Conservative Allocation Fund | $311,235 | $77,082 | $234,153 | 304% |
| Hartford Healthcare Fund | $2,821,569 | $1,933,093 | $888,476 | 46% |
| Hartford Capital Appreciation Fund | $47,574,050 | $29,240,246 | $18,333,804 | 63% |
| Hartford Floating Rate Fund | $29,784,890 | $9,158,905 | $20,625,985 | 225% |

| Hartford Fund | Net Paid Adviser (After Deducting Fees Paid to Each Fund's Sub-Adviser) | Net Paid Sub-Adviser | Difference | % By Which Adviser's Fee Is Greater Than Sub-Adviser's Fee |
|---|---|---|---|---|
| Hartford Small Company Fund | $3,348,392 | $2,691,683 | $656,709 | 24% |
| **Totals** | **$104,777,861** | **$51,429,222** | **$53,348,639** | **104%** |

48.   The table above demonstrates that in fiscal year 2013 the total investment management fees charged to the Hartford Funds equaled $156,207,083, of which $51,429,222 were paid to the Funds' sub-advisers, and $104,777,861 were retained by HFMC and HIFSCO.

49.   During fiscal year 2013, the investment management fees paid to HFMC and HIFSCO by each of the Hartford Funds were at a minimum 24%, and at a maximum 497%, greater than the fee paid to the Funds' sub-advisers.   Overall, HFMC and HIFSCO's fees exceeded the sub-advisory fees by 104%.

50.   Pursuant to the Investment Management Agreements, in exchange for the investment management fees that HFMC receives, HFMC allegedly provides both (a) investment management services and (b) certain administrative services to the Hartford Funds.   As explained below, the total fee (*i.e.*, the total investment management fee) HFMC should receive for these alleged services should be a small fraction of the fees that are paid to each Fund's sub-adviser.

> **(a)   HFMC's Alleged Investment Management Services Pursuant to the Investment Management Agreements (*i.e.*, services Defendant claims to provide in exchange for its investment management fee).**

51.   HFMC entered into Investment Management Agreements with each of the Hartford Funds.   Further, HFMC has entered into investment sub-advisory agreements with Wellington. The table below represents a comparison of the investment management responsibilities that

HFMC undertakes pursuant to the Investment Management Agreements with the Hartford Funds, and the investment management responsibilities delegated to Wellington pursuant to the Investment Sub-Advisory Agreements with the Hartford Funds.   The services listed in the left hand column, are all contained in the Investment Management Agreements with the Hartford Funds under the heading of Section 2 "Investment Management Services."

| Investment Management Agreements (Services Allegedly Performed by HFMC) | Investment Sub-Advisory Agreements |
| --- | --- |
| [A comparable provision does not exist in the Investment Management Agreements] | "2.   The Sub-Adviser **shall evaluate and implement an investment program appropriate for each Portfolio**, which shall be amended and updated from time to time . . . as determined by the Adviser and the Sub-Adviser." |
| "2.   Investment Management Services<br><br>(a) The Adviser shall, or shall cause an affiliate to: (i) regularly provide investment advice and recommendations to each Portfolio [the Funds] with respect to its investments, investment policies and the purchase of securities; (ii) supervise continuously the investment management program of each Portfolio and the composition and performance of its portfolio securities and determine which securities shall be purchased or sold by each Portfolio; and (iii) arrange, subject to the provisions of Section 4 hereof [the delegation provision], for the purchase of securities and other investments for each Portfolio and the sale of securities and other investments held in each Portfolio." | "3.  The Sub-Adviser, in consultation with the Adviser when appropriate, will make **all determinations with respect to the investment of the assets of the Portfolios and the purchase or sale of portfolio securities, and shall take such steps as may be necessary to implement the same.**  Such determinations and services shall include advising the Company's Board of Directors of the manner in which voting rights, rights to consent to corporate action, and any other non-investment decisions pertaining to a Portfolio's securities should be exercised." |
| "(b) The Adviser shall provide, or cause an affiliate to provide, such economic and statistical data relating to each portfolio and such information concerning important economic political and other developments as the Adviser shall deep appropriate or as shall be requested by the Company's Board of | "4.  The Sub-Adviser will regularly furnish reports with respect to the Portfolios at period meetings of the Company's Board of Directors, and at such other times as may be reasonably requested by the Company's Board of Directors, which reports shall include the **Sub-Advisers economic outlook and investment** |

| Investment Management Agreements (Services Allegedly Performed by HFMC) | Investment Sub-Advisory Agreements |
|---|---|
| Directors." | strategy and a discussion of the portfolio activity and the performance of the Portfolios since the last report." |
| [A comparable provision does not exist in the Investment Management Agreements] | "5.  The Sub-Adviser shall manage each Portfolio in conformity with the Company's Articles of Incorporation and By-laws . . . the Investment Company Act . . . and to the investment objectives . . . of each Portfolio as set forth in the Portfolio's prospectus . . . ." |
| [A comparable provision does not exist in the Investment Management Agreements] | "6.  The Sub-Adviser will select the brokers or dealers that will execute the purchases and sale of portfolio securities . . . ." |

(emphasis added)

52.  As the above table reflects, pursuant to the Investment Sub-Advisory Agreements, Wellington is responsible for substantially all of the investment management services required by the Hartford Funds.  Although HFMC's role is limited and is predominantly supervisory in nature, HFMC's fees are significantly more than Wellington's investment management fees.

53.  The evaluation and implementation of a fund's investment program is generally the most expensive, and important, investment management activity with respect to a fund.  With respect to the Hartford Funds, this service is provided by Wellington, not HFMC.  According to the Investment Sub-advisory Agreements, it is Wellington which "evaluate[s] and implement[s] an investment program appropriate for each [fund]," while HFMC's role is limited to supervising the Funds' investment program and providing minimal administrative functions.

54.  Wellington's assumption of substantially all of the investment management services is specifically contemplated in the Investment Management Agreements that HFMC entered into

with each of the Hartford Funds, as those agreements contain the following investment management delegation provision:

> The Adviser [HFMC] . . . may engage one or more investment advisers that are registered as such under the Investment Advisers Act of 1940, as amended, to act as sub-adviser with respect to existing and future Portfolios of the Company. **Such sub-adviser or sub-advisers shall assume such responsibilities and obligations of the Adviser pursuant to this Investment Management Agreement as shall be delegated to the sub-adviser or sub-advisers, and the Adviser will supervise and oversee the activities of any such sub-adviser or sub-advisers.** In addition, the Adviser may subcontract for any of the administrative services set forth in Section 3 [of the Investment Management Agreement] (emphasis added).

55.  In light of this delegation provision, HFMC's investment management services are significantly limited to oversight and supervising Wellington.  HFMC's supervisory role is further limited given that it is the HMF and HMFII's Boards of Directors who are charged with the substantial supervision of the Hartford Funds.  According to the March 1, 2013 Combined Statement of Additional Information for the Hartford Funds ("SAI"), the Boards: "(i) provide[] broad supervision over the affairs of [HMF and HMFII] and the Funds and (ii) elect[] officers who are responsible for the day-to-day operations of the Funds and the execution of policies formulated by the Boards of Directors."

56.  If HFMC performed the investment management services listed in the Investment Management Agreements (see Table at ¶ 51) for each Hartford Fund, and if the fees charged for these alleged services were the product of arm's-length bargaining, such fees should have been, for each Hartford Fund, a fraction of the investment management fees charged to each Hartford Fund, in light of the substantial investment management services Wellington provides to the Hartford Funds under the terms of the sub-advisory agreements.

**(b)   HFMC's Alleged Administrative Services Pursuant to the Investment Management Agreements (i.e., services HFMC claims to provide in exchange for the investment management fees it retains)**

57.   The Investment Management Agreements that HFMC entered into with the Hartford Funds, in addition to containing a section entitled "Investment Management Services," also contains a section entitled "Administrative Services," which lists the administrative services that HFMC allegedly provides, or causes an affiliate to provide, to the Hartford Funds.   The "Administrative Services" section of the Investment Management Agreements, which HFMC entered into with each Hartford Fund, is reproduced in the table on the following page.

| Investment Management Agreements - Administrative Services |
| --- |
| **3.** In addition to the performance of investment advisory services, the Adviser shall perform, or shall cause an affiliate to perform, the following services in connection with the management of the Company: |
|     **(a)**   assist in the supervision of all aspects of the Company's operation, including the coordination of all matters relating to the functions of the custodian, transfer agent or other shareholder servicing agents (if any), accountants, attorneys and other parties performing services or operational functions for the Company; |
|     **(b)**   provide the Company with the services of persons, who may be the Adviser's officers or employees, competent to serve as officers of the Company and to perform such administrative and clerical functions as are necessary in order to provide effective administration for the Company, including the preparation and maintenance of required reports, books and records of the Company; and |
|     **(c)**   provide the Company with adequate office space and related services necessary for its operations as contemplated in this Agreement. |
|     **(d)**   provide such other services as the parties hereto may agree upon from time to time. |

58.   Thus, according to Section 3(a) of the Investment Management Agreements, HFMC will "assist in the supervision of all aspects of the Company's [i.e., Hartford Funds] operations, including the coordination of all matters relating to the functions of custodian,

transfer agent or other shareholder servicing agents (if any), accountants, attorneys and other parties performing services or operational functions for the Company."

59.     The Hartford Funds, however, pay for these services pursuant to separate agreements and/or separate fees.  For example, according to the Annual Report for the Hartford Healthcare Fund, for the fiscal year ended October 31, 2013, this fund paid a custodian fee of $10,000, a transfer agent fee of $911,000, accounting services fees of $74,000, an administrative service fee (undefined) of $58,000, registration and filing fees of $104,000, Board of Directors' fees of $12,000, audit fees of $15,000 and other expenses (undefined) of $100,000, for a total of $1,284,000. These fees are produced below in chart format.  A similar chart is contained in the Hartford Healthcare Fund's 2013 Annual Report, Statement of Operations, for fiscal year ended October 31, 2013.

| Expenses | Dollar Amount |
|---|---|
| Investment Management Fee | 4,755,000 |
| Administrative Services Fee | |
| - Class R3 | 35,000 |
| - Class R4 | 21,000 |
| - Class R5 | 2,000 |
| Transfer Agent Fees | |
| - Class A | 648,000 |
| - Class B | 48,000 |
| - Class C | 142,000 |
| - Class I | 71,000 |
| - Class R3 | 2,000 |
| Distribution Fees | |
| - Class A | 834,000 |
| - Class B | 144,000 |
| - Class C | 918,000 |
| - Class R3 | 89,000 |
| - Class R4 | 34,000 |
| Custodian Fees | 10,000 |
| Accounting Services Fees | 74,000 |
| Registration and Filing Fees | 104,000 |
| Board of Directors Fees | 12,000 |
| Audit | 15,000 |

| | |
|---|---|
| Other Expenses | 100,000 |
| **Total Expenses (before waivers and fees paid indirectly)** | **8,058,000** |

60.   The Annual Reports for all of the Hartford Funds (like the Hartford Healthcare Fund) reflect that, for fiscal year ended October 31, 2013, these funds also paid, in addition to paying HFMC an investment management fee, the following fees: Administrative Services Fees, Transfer Agent Fees, Distribution Fees, Custodian Fees, Accounting Services Fees, Board of Directors Fees, Audit Fees, and Other Expenses. *See also* Exhibit A, which contains similar charts for the other Hartford Funds and reflect that these funds were also charged an Administrative, Transfer agent, Distribution, Custodian, Accounting Services, Board of Director, Audit and Other Expense Fee, in addition to an investment management fee.  These charts are also based on data contained in the Annual Reports for each of these funds.

61.   Further evidence that the Hartford Funds separately pay for the services listed in Section 3(a) of the Investment Management Agreements is confirmed by the fact that all of the Hartford Funds are charged an "Other Expense Charge."

62.   For example, the March 1, 2014 Annual Prospectus for the Hartford Healthcare Fund, reflects that investors in this fund pay the following fees:

| | Class A | Class B | Class C | Class I | Class R3 | Class R4 | Class R5 | Class Y |
|---|---|---|---|---|---|---|---|---|
| Management fees | 0.89% | 0.89% | 0.89% | 0.89% | 0.89% | 0.89% | 0.89% | 0.89% |
| Distribution & Services (12b-1) fees | 0.25% | 1.00% | 1.00% | None | 0.50% | 0.25% | None | None |
| **Other Expense** | **0.26%** | **0.40%** | **0.22%** | **0.19%** | **0.27%** | **0.22%** | **0.19%** | **0.07%** |

63.   This table reflects in basis points the annual fees an investor pays for investing in the Hartford Healthcare Fund.

64. As the table in paragraph 62 reflects, in addition to being charged an annual investment management fee, investors are also charged an "Other Expense Charge." According to the SEC, the Other Expense Charge usually covers expenses for "payments to transfer agents, securities custodians, providers of shareholder accounting services, attorneys, auditors, and fund independent directors." *See* Division of Investment Management: Report on Mutual Fund Fees and Expenses, U.S. Securities and Exchange Commission, § III.B.1. http://www.sec.gov/news/studies/feestudy.htm#P244_50400; U.S. Securities and Exchange Commission, *Mutual Fund Fees and Expenses,* http://www.sec.gov/answers/mffees.htm.

65. Exhibit A reproduces the fee tables for the remaining Hartford Funds, which reflect that investors in these funds also paid an "Other Expense Charge," in addition to paying an investment management fee.[3]

66. Thus, through the Hartford Funds' "Other Expense Charge," which is separate from HFMC's investment management fees, the Hartford Funds paid for the services listed in Section 3(a) of the Investment Management Agreement. Therefore, it would be improper, and excessive, for HFMC to charge for any of these services through its investment management fee.

67. In addition to the above SEC disclosures in the Annual Reports and Prospectuses, which reflect that the services listed in Section 3(a) are paid for independently of the investment management fees the Hartford Funds paid to HFMC, the SAI states the following:

> Each Fund pays its own expenses including, without limitation: (1) expenses of maintaining the Fund and continuing its existence; (2) registration of the Fund under the 1940 Act; (3) auditing, accounting and legal expenses; (4) taxes and interest; (5) governmental fees; (6) expenses of issue, sale, repurchase and redemption of Fund shares; (7) expenses of registering and qualifying the Fund and its shares under federal and state securities

---

[3] The information contained in these fee tables is derived from each Fund's March 1, 2014 Annual Prospectus.

laws and of preparing and printing prospectuses for such purposes and for distributing the same to shareholders and investors, and fees and expenses of registering and maintaining registrations of the Fund and of the Fund's principal underwriter, if any, as broker-dealer or agent under state securities laws; (8) expenses of reports and notices to shareholders and of meetings of shareholders and proxy solicitations thereof; (9) expenses of reports to governmental officers and commissions; (10) insurance expenses; (11) fees, expenses and disbursements of custodians for all services to the Fund; (12) fees, expenses and disbursements of transfer agents, dividend disbursing agents, shareholder servicing agents and registrars for all services to the Fund; (13) expenses for servicing shareholder accounts; (14) any direct charges to shareholders approved by the directors of the Fund; (15) compensation and expenses of directors of the Fund, other than those who are also officers of The Hartford; and (16) such nonrecurring items as may arise, including expenses incurred in connection with litigation, proceedings and claims and the obligation of the Fund to indemnify its directors and officers with respect thereto.

68.   As multiple SEC filings demonstrate, the services listed in Section 3(a) of the Investment Management Agreements are paid by fees that are separate from the investment management fees paid to HFMC.   Further, as Section 3(a) of the Investment Management Agreements confirms, HFMC's role is limited to the "supervision" and "coordination" of the services listed in Section 3(a).   However, the Hartford Funds' accounting, transfer agent and custodian services are accounted for pursuant to separate agreements, which require the Funds to pay separate fees for those services.   Further, as the Annual Reports for the Hartford Funds reflect, the fees for the performance of the actual services listed in Section 3(a) are much less than the investment management fee for each Hartford Fund.   Therefore, if the fees to actually perform the services listed in Section 3(a) are significantly less than the investment management fee for each Hartford Fund, then the fees to supervise these services should, if a product of arm's-length bargaining, be a fraction of the fees charged to perform such services.

69. Section 3(b) of the Investment Management Agreement states that HFMC shall "provide the Company with the services of persons . . . to provide effective administration for the Company, including the preparation and maintenance of required reports, books and records of the Company."

70. Each of the Hartford Funds' Annual Reports reflect that for year ended October 31, 2013, security holders in the funds, paid a separate "Administrative Services Fee," (i.e., independent of the investment management fee) which presumably covered these services. However, even if these services were paid for through HFMC's investment management fee, under the Investment Sub-Advisory Agreements, Wellington must provide reports to HFMC and the Funds' Boards, which "include the Sub-Adviser's economic outlook and investment strategy and a discussion of the portfolio activity and the performance of the Portfolios since the last report." Thus, even if the investment management fees that HFMC charged to the Hartford Funds were also used to pay for the services allegedly provided pursuant to paragraph 3(b) of the Investment Management Agreements, the data needed for those services was largely provided by the fund's sub-adviser, presumably because it is the fund's sub-adviser which actually performs the substantial investment advisory/management services, and thus the fees for such services should be minimal.

71. As further evidence of the Hartford Funds' sub-adviser's substantial reporting and investment management role, Hartford relied upon the fund's sub-adviser, not HFMC, to provide an explanation in the Hartford Funds' SEC filings as to how the funds performed in the prior year and what the fund's outlook is for next year. Specifically, the Hartford Funds' Annual Reports state, for each Hartford Fund: "[t]he views expressed in the Fund's Manager Discussion under 'Why did the Fund perform this way?' and 'What is the outlook?' are views of the Fund's

sub-adviser and portfolio management team . . . ." The "portfolio management team" are employees of the sub-advisers.

72.   Section 3(c) (Administrative Services Section) of the Investment Management Agreements provides that HFMC will "provide the Company with adequate office space and related services necessary for its operations as contemplated in this Agreement."

73.   As described above, substantially all of the investment management services are performed by the Hartford Fund's sub-adviser.   With respect to the administrative services, HFMC's role is limited to oversight and is essentially supervisory in nature since it is not even a party to the agreements under which most of these administrative services are provided.   Thus, given (i) the magnitude of the services that Wellington provides as the Funds' sub-adviser, (ii) that Wellington provides such services at its own expense (*i.e.*, it provides the office space and related services needed for the substantial investment management services it provides under its sub-advisory agreements), and (iii) that Wellington, despite performing substantially all of the investment management services for the Hartford Funds at its own expense, is paid 104% less than HIFSCO was paid in 2013, the fees of HFMC for its alleged services should be a fraction of the fees that are charged by Wellington.   Further, the Annual Reports for each of the Hartford Funds reflects two ambiguous fees: "Administrative Services Fee" and "Other Expenses" (*see* Table at ¶ 59), which may pay for this office space, and thus, such office space may be paid for through fees separate from each Fund's investment management fee.

74.   The evaluation and implementation of a fund's investment program should be the most expensive service that is listed in the Investment Management Agreements. HFMC delegated, consistent with the Investment Management Agreements, substantially all of the

investment management services required by the Hartford Funds to Wellington, and the investment management role that remained for HFMC was predominately supervisory in nature.

75.   With respect to the Administrative Services listed in Section 3(a) of the Investment Management Agreements, HFMC's role was limited to supervising the performance of the services, and such supervisory role should have resulted in HFMC receiving fees that were a small fraction of the fee to perform the actual services.

76.   With respect to the Administrative Services listed in Section 3(b) of the Investment Management Agreements, these services should have been paid for by fees that were charged to the Hartford Funds that were separate, and in addition to, HFMC's investment management fee.

77.   Given that HFMC sub-contracted to a third party the most crucial services required by the Hartford Funds, the expenses it should have incurred for providing the services listed in Section 3(c) of the Investment Management Agreements should have been very small.

78.   HFMC's total investment management fee for each Hartford Fund bore no reasonable relationship to the services they rendered.

79.   Given that substantially all of the investment management services have been delegated to the Fund's sub-adviser and HFMC's responsibility is limited and essentially supervisory in nature, the investment management fees HFMC received were disproportionate to the value of the investment management services it rendered.

80.   Plaintiffs, on behalf of the Hartford Funds, are entitled to recover the investment management fees received (and continuing to be received) by HFMC in breach of its fiduciary duty to the Funds with respect to such compensation.  The excessive management fees represent compensation for advisory services, and thus, are subject to an ICA § 36(b) claim.

81.

**B.   THE ECONOMIES OF SCALE ENJOYED IN CONNECTION WITH THE INVESTMENT MANAGEMENT SERVICES WERE NOT PASSED ON TO THE PLAINITFFS AND OTHER SECURITY HOLDERS OF THE FUNDS AS REQUIRED BY SECTION 36(b), BUT WERE KEPT BY HFMC IN VIOLATION OF ITS FIDUCIARY DUTY**

82.   The legislative history of ICA § 36(b), 15 U.S.C. § 80a-35(b), recognizes that an investment adviser's failure to pass on economies of scale to the fund is the principal cause of excessive fees:

> It is noted . . . that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry. In some instances these economies of scale have not been shared with investors. Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size. Accordingly, the best industry practice will provide a guide.

S. Rep. No. 91-184, at 5-6 (1969), as reprinted in 1970 U.S. Code Cong. & Ad. News, at 4901-02.

83.   The amount of the compensation received by the adviser should be evaluated in context with the economies of scale realized by a fund. Economies of scale are created when assets under management increase more quickly than the cost of advising and managing those assets. The work required to operate a mutual fund does not increase proportionately with the assets under management. Investment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size. A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion. (Size may impair performance, but it imposes little logistical challenge.) David Swensen, *Unconventional Success: A Fundamental Approach to Personal Investment*, Free Press (2005), p. 238. "The intrinsic characteristics of the mutual-fund . . . suggest that economies of scale should lead to lower fees as assets under management [i.e., the amount people invest in a fund] increase." *Id.* at 237. Economies of scale with respect to a mutual fund

exist, and are available to be passed along to the fund's investors, because "investment management efforts . . . do not increase along with portfolio size." *Id.* at 238. Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit." *Id.*

84. On a per share basis, it does not cost more to manage additional assets in a growing fund because economies of scale occur at both the fund complex and portfolio level for various costs incurred. Moreover, fixed costs are spread over more assets as a fund grows in size.

85. Indeed, investment management organizations can realize economies of scale from increased assets within a particular mutual fund and from increased total assets in all mutual funds under management.

86. As an example, if a fund has fifty million dollars ($50,000,000) of assets under management and is charged a fee of 75 basis points (100 basis points = 1%; 1 basis point equals 1/100th of a percent), the fee equals $375,000 per year. A comparable mutual fund with five hundred million dollars ($500,000,000) of assets under management would generate a fee of three million seven hundred and fifty thousand dollars ($3,750,000). Similarly, a mutual fund with five billion dollars ($5,000,000,000) of assets would generate a fee of thirty-seven million, five hundred thousand dollars ($37,500,000) per year.

87. As assets under management increase, however, the cost of providing services to additional assets does not increase at the same rate, resulting in tremendous economies of scale. In other words, it simply does not cost a fund's adviser ten times as much to render services to a ten billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund. In fact, the investment management services or securities selection process for a ten billion dollar fund and a one billion dollar fund, or even a one million dollar fund, are virtually identical,

generating enormous economies of scale.  Indeed, at some point, the additional cost to advise each additional dollar in the fund (whether added because of a rise in the value of the securities or additional contributions by current or new security holders) approaches a number at or close to zero.

88.    The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO").  Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of management services.  *See SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses* (Dec. 2000) ("SEC Report"), at 30-31; GAO, *Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives* (June 2000) ("GAO Report"), at 9.  The GAO has estimated as much as 64% of mutual fund asset growth has been the result of market appreciation rather than additional purchases of new shares of a fund.  GAO Report at 9.

89.    Economies of scale exist not only fund by fund but also with respect to an entire fund complex and even with respect to an investment adviser's entire scope of operations, including services provided to institutional and other clients.  *See John P. Freeman & Stewart L. Brown, Mutual Fund Advisory Fees: The Cost of Conflicts of Interest,* 26 J. CORP. L. 610, at 621 n. 62 (2001) (the "Freeman & Brown Study") (citing Victoria E. Schonfeld & Thomas M.J. Kerwin, *Organization of a Mutual Fund*, 49 BUS. LAW 107 (1993)).

90.    As fund portfolios grow, they quickly create economies of scale and eventually the incremental cost of servicing additional assets approaches zero.  As the GAO confirms, it is

possible for the adviser to service the additional assets with zero additional costs.  *See* GAO Report, at 9 (noting that growth from portfolio appreciation is unaccompanied by costs).

91.   Although significant economies of scale exist for each of the Hartford Funds, the associated cost savings largely have been appropriated for the benefit of HFMC rather than being shared with the Hartford Funds.  The economies-of-scale benefits that have been captured and misappropriated by HFMC can and have generated huge, unreasonable, excessive, and undeserved profits for HFMC in breach of its fiduciary duty to the Hartford Funds with respect to such compensation.

92.   The management fees received by HFMC are paid as a varying percentage of assets under management.  The Hartford Funds employ a declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase.  The fees vary based on the amount of assets under management, and are reduced as the total amount of assets under management increase.  *See* following table.

### HARTFORD FUNDS' FEE BREAKDOWN
### ("M" refers to "Million" and "B" refers to "Billion")

| Hartford Fund | Defendant's Fee Schedule (annual rate based on average daily net assets) | Wellington Fee Schedule (annual rate based on average daily net assets) |
|---|---|---|
| Hartford Balanced Fund | First $500 million – 0.6900% <br> Next $500 million – 0.6250% <br> Next $4 billion – 0.5750% <br> Next $5 billion – 0.5725% <br> Amt. over $10B – 0.5700% | **REDACTED** |
| Hartford Growth Opportunities Fund | First $250 million – 0.8000% <br> Next $4.75 billion – 0.7000% <br> Next $5 billion – 0.6975% <br> Amt. over $10B – 0.6950% | **REDACTED** |

| Hartford Fund | Defendant's Fee Schedule (annual rate based on average daily net assets) | Wellington Fee Schedule (annual rate based on average daily net assets) |
|---|---|---|
| Hartford Inflation Plus Fund | First $500 million – 0.5000%<br>Next $500 million – 0.4500%<br>Next $1.5 billion – 0.4450%<br>Next $2.5 billion – 0.4400%<br>Next $5 billion – 0.4300%<br>Amt. over $10B – 0.4200% | **REDACTED** |
| Hartford Healthcare Fund | First $500 million – 0.9000%<br>Next $500 million – 0.8500%<br>Next $4 billion – 0.8000%<br>Next $5 billion – 0.7975%<br>Amt. over $10B – 0.7950% | **REDACTED** |
| Hartford Conservative Allocation Fund | First $500 million – 0.1500%<br>Next $500 million –0.1000%<br>Next $1.5 billion –0.0900%<br>Next $2.5 billion –0.0800%<br>Next $2.5 billion –0.0700%<br>Next $2.5 billion –0.0600%<br>Amount Over $10B – 0.0500% | **REDACTED** |
| Hartford Capital Appreciation Fund | First $500 million – 0.8000%<br>Next $500 million – 0.7000%<br>Next $4 billion – 0.6500%<br>Next $5 billion – 0.6475%<br>Amt. over $10B – 0.6450% | **REDACTED** |
| Hartford Floating Rate Fund | First $500 million – 0.6500%<br>Next $2 billion – 0.6000%<br>Next $2.5 billion – 0.5900%<br>Next $5 billion – 0.5800%<br>Amt. over $10B – 0.5700% | **REDACTED** |
| Hartford Small Company Fund | First $250 million – 0.8500%<br>Next $250 million – 0.8000%<br>Next $500 million – 0.7500%<br>Next $500 million – 0.7000%<br>Next $3.5 billion – 0.6500%<br>Next $5 billion – 0.6300%<br>Amt. over $10B – 0.6200% | **REDACTED** |

93.  This fee structure known as "breakpoints" implicitly recognizes the economies of scale and gives the appearance that the funds share in those benefits.  A fee breakpoint has been explained as follows:

> Many funds employ a declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase.  The declining rate schedule reflects the expectation that costs efficiencies or scale economies will be realized in the management and administration of the fund's portfolio and operations as the fund grows.

*See* Freeman & Brown Study, at 620, n. 59.

94.  Economies of scale can be passed on to and shared with the mutual funds as assets increase if management fee breakpoints are installed at higher asset levels (but at asset levels that are reachable), or if lower asset based investment advisory fees are adopted  by  the management company in response to increases in the overall level of assets under management.

95.  The benefits achieved by the Hartford Funds' economies of scale can and should have been shared with the Funds and their security holders by reducing and/or eliminating the management fees and other costs charged to the Funds by HFMC.

96.  In the case of the Hartford Funds, however, HFMC has failed to share meaningful savings with the Funds as a result of economies of scale.  While the Investment Management Agreements include advisory fee breakpoints, these breakpoints are meaningless, because as a practical matter, they did not pass on any of the economies of scale to Plaintiffs, and the other security holders of the Funds.  The mere existence of breakpoints does not mean that economies of scale are adequately passed on to security holders of the Funds, unless the breakpoints are reached.

97. Indeed, the breakpoints are designed by HFMC to benefit itself rather than the Hartford Funds. As described below, the initial breakpoints are set too high, the breakpoints are spaced too far apart, and the fee reductions made at breakpoints are far too small, thereby depriving Plaintiffs and the other security holders of the Funds of the benefits of the economies of scale created by the contribution of their capital to the Funds.

98. For instance, the first breakpoint occurs at $500 million for the Hartford Balanced Fund, the Hartford Inflation Plus Fund, the Hartford Healthcare Fund, the Hartford Conservative Allocation Fund, the Hartford Capital Appreciation Fund, and the Hartford Floating Rate Fund, and at $250 million for the Hartford Growth Opportunities Fund and the Hartford Small Company Fund. *See* Table at ¶ 92. Significant economies of scale are created by the Plaintiffs' and the other security-holders' investments in the Hartford Funds long before this initial breakpoint, but they are not shared with the Funds. HFMC retains for itself the benefits created by the economies of scale between breakpoints. A flat management fee (in dollars, not percentage) or lower breakpoints would allow the Hartford Funds to capture economies of scale that rightfully belongs to them under Section 36(b), while also allowing HFMC to earn a fair and competitive profit for its services.

99. For the year ended October 31, 2013, the Hartford Conservative Allocation Fund has not been able to avail itself of even the first breakpoint in HFMC's fee schedule. Even though the Hartford Balanced Fund, the Hartford Growth Opportunities Fund, and the Hartford Healthcare Fund were able to take advantage of the first breakpoint, it is unlikely that they will achieve the remaining breakpoints because the breakpoints are spaced too far apart.

100. Furthermore, the Hartford Capital Appreciation Fund reached its final breakpoint of over $10 billion in assets over $1 billion ago (for the year-ended October 31, 2013 this Fund has

almost $12 billion in assets).   However, HFMC failed to install any additional breakpoints beyond the $10 billion breakpoint.   By not doing so, Defendant has failed to pass on to this Fund's security holders, including Plaintiffs, the substantial economies of scale that occurred during the appreciation of assets in the Fund from $10 billion to approximately $12 billion.

101. Defendant's breakpoint schedule is the breakpoint schedule that impacts the investment management fees that Plaintiffs pay.   Conversely, the Funds' sub-advisory breakpoint schedule determines how the overall investment management fee which Plaintiffs pay to Defendant is allocated between Defendant and Wellington.   Thus, if a breakpoint with respect to Wellington's sub-advisory fee schedule is reached, it does not impact the total amount of investment management fees Plaintiffs pay.   Only if a breakpoint on Defendant's fee schedule is reached do Plaintiffs receive an investment management fee reduction. Therefore, if Defendant negotiates with Wellington to charge a lower initial sub-advisory fee, as compared to Defendant's investment management fee, along with a breakpoint schedule that reduces the Wellington's initial sub-advisory fee at asset levels lower than the breakpoint schedule applicable to Defendant, then Defendant benefits because it is able to retain a larger portion of the investment management fees that Plaintiffs pay.

102. Wellington is a for-profit independent sub-adviser to the Hartford Funds.   Defendant negotiated at arm's-length, not only to pay Wellington much lower initial investment management fees than Defendant charges the Hartford Funds, but also for a breakpoint schedule at asset levels much lower than Defendant's breakpoint schedule.   *See* Table at ¶ 92.

103. Wellington's fee schedules for the Funds allowed it to accomplish all of the services it was required to undertake pursuant to its sub-advisory agreements and earn a profit.

104. With respect to the Hartford Balanced Fund, Defendant negotiated a breakpoint schedule with Wellington, such that Wellington's initial investment management fee was 22 basis points, and, under this schedule, graduated fee reductions commenced after assets in this fund surpassed $50 million. *See* Table at ¶ 92.  This graduated fee reduction schedule results in Wellington charging an investment management fee of just 12.5 basis points on assets in excess of $500 million.  *Id.*  In contrast, Defendant's breakpoint schedule sets HFMC's initial investment management fee at 69 basis points, and only after assets in the fund exceed $500 million is there any reduction in HFMC's fees.  Further, the graduated reductions are of such a small value that if assets in this fund exceed $10 billion, HFMC's fee is only reduced to 57 basis points. *Id.*

105. With respect to the Hartford Healthcare Fund, Defendant negotiated a breakpoint schedule with Wellington for an initial investment management fee of 45 basis points, with graduated fee reductions commencing after assets in this fund surpass $100 million. *See* Table at ¶ 92.  This graduated fee reduction schedule results in a fee of just 30 basis points on assets in excess of $500 million.  *Id.*  In contrast, Defendant's breakpoint schedule sets HFMC's initial investment management fee at 90 basis points, and only after assets in this fund exceed $500 million is there any reduction in HFMC's fees.  Further, the graduated reductions are of such a small value that if assets in this fund exceed $10 billion, HFMC's fee only drops to 79.5 basis points. *Id.*

106. This disparity between Defendant's breakpoint schedule, which determines the total amount of investment management fees that HFMC collects from the Hartford Funds, and Wellington's breakpoint schedule, which determines the portion of the overall investment

management fees that Defendant must pay to Wellington, reflects that Defendant is using the breakpoint mechanism to benefit itself rather than the Hartford Funds and the Plaintiffs.

107. Defendant benefits from this breakpoint arrangement because as Wellington grows the Funds' assets, the overall fees Defendant collects from each Fund increase on account of the following: (A) the investment management fees that Defendant collects are based on a percentage of assets in the Funds, and (B) the portion of the investment management fees Defendant collects from the Funds and must pay to Wellington decreases on account of the Wellington's breakpoint schedule.   If the breakpoint schedule that Defendant negotiated at arm's-length with Wellington was used as the breakpoint schedule for Defendant's investment management fee, a greater portion of the economies of scale generated by asset growth would be shared with Hartford Funds' security holders.

108. Accordingly, Defendant fails to share with the Hartford Funds' security holders the benefits of economies of scale realized from the Hartford Funds.   Defendant's receipt of these fees is particularly excessive given that the cost of the oversight functions it performs for the Funds should not increase as the Funds' assets increase, resulting in enormous economies-of-scale benefits that Defendant retains for itself but that should be shared with the Funds and their security holders.

109. As assets under management have grown, the management fees paid to Defendant have grown dramatically, despite the economies of scale realized by Defendant.   Defendant has not shared with the Plaintiffs, and other security holders of the Funds, the economies of scale it has gained from that growth.

110. The investment management fees paid to Defendant are disproportionate to the value of services rendered, and therefore excessive, especially when compared to the rates charged by

Wellington or by competitors (discussed in the next section), as well as the excess profits resulting from these economies of scale. The economies of scale enjoyed by Defendant with respect to the Hartford Funds have not been adequately shared with the Funds, as required by § 36(b) in breach of HFMC's § 36(b) fiduciary duty to the Funds with respect to such compensation.

### C. COMPARATIVE FEE STRUCTURES CHARGED BY THE FUNDS' SUB-ADVISER AND OTHER MUTUAL FUND COMPLEXES FOR SIMILAR INVESTMENT MANAGEMENT SERVICES DEMONSTRATE THAT DEFENDANT HAS CHARGED THE FUNDS EXCESSIVE FEES THAT BREACHED DEFENDANT'S FIDUCIARY DUTY

111. An analysis of: (1) the fees paid to Wellington and (2) investment management fees charged by Defendant's competitors to mutual funds comparable to the Hartford Funds demonstrates that Defendant has charged the Hartford Funds excessive investment management fees that violate Defendant's fiduciary duty with respect to the receipt of compensation. The following relevant comparative fee structures establish that Defendant is charging advisory fees to the Hartford Funds that are disproportionate to the value of the services rendered.

### 1. Fee Structure of the Hartford Funds' Sub-Adviser

112. Because Wellington is a for-profit company that negotiated its fee with Defendant, the fees that Wellington charges provide a guidepost of the cost of the investment advisory services provided to the Hartford Funds, including a comfortable profit margin. Compared to the fees charged by Wellington, which actually performs the majority of the substantive advisory services to the Hartford Funds, the additional fees charged by Defendant for its oversight of the Hartford Funds are unjustified and excessive.

113. While Plaintiffs do not challenge the fees paid to Wellington (the sub-adviser to the Hartford Funds), those rates do provide a measure of how much the investment advisory services cost (and the economies of scale realized by the advisers). Indeed, the fees charged by

Wellington are indicative of the fee the Funds should pay for the investment management services.   HFMC charges far more than Wellington, even though Wellington assumes the obligations of HFMC to provide substantially all of the investment advisory services to the Funds.

114. Since Defendant's investment management fees charged to the Plaintiffs, and the other shareholders of the Hartford Funds, and collected by Defendant were far in excess of the Wellington's fee amount (which provides substantially all of the investment management services), Defendant's fees were necessarily so disproportionately large that they bore no reasonable relationship to the value of the services rendered and could not have been the product of arm's-length bargaining.

**2.     Fees Charged to Other Mutual Fund Complexes for Similar Investment Management Services**

115. Vanguard generally provides the same services to the Vanguard Health Care Fund, the Vanguard Wellington Fund and the Vanguard Morgan Growth Fund (the "Vanguard Funds") as HFMC provides to the comparable Hartford Funds.

116. Wellington is the sub-adviser to both the Vanguard Healthcare Fund and the Hartford Healthcare Fund.   Wellington is the sub-adviser to both the Vanguard Wellington Fund and the Hartford Balanced Fund. Wellington is a sub-adviser to both the Vanguard Morgan Growth Fund and the Hartford Growth Opportunities Fund.[4]

117. The Vanguard Funds and the Hartford Funds listed in the prior paragraph, generally have the same investment philosophies.   Further, the terms of the sub-advisory agreements Wellington has entered into with the above listed Hartford Funds, and the terms of the sub-

---

[4] The Vanguard Morgan Growth Fund employs five sub-advisers, one of them being Wellington. The total sub-advisory fees paid to all of the fund's sub-advisers equals 17 bps.

advisory agreements that Wellington as entered into with the above-listed Vanguard Funds, are not materially different.

118. Vanguard does not receive an investment management fee from the Vanguard Health Care Fund or the Vanguard Wellington Fund. In contrast, HFMC charges separate investment management fees to the comparable Hartford Funds, charging an investment management fee equal to 52 basis points on the Hartford Healthcare Fund and an investment management fee equal to 54 basis points on the Hartford Balanced Fund.

119. Vanguard charges a 1 basis point investment management fee to the Vanguard Morgan Growth Fund because Vanguard itself manages a small portion of that fund's assets (approximately 2%) and has not delegated responsibility for those assets to the fund's other sub-advisers. In contrast, HFMC charges the comparable Hartford fund, the Hartford Growth Opportunities Fund, an investment management fee of 44 basis points even though it has delegated its investment management responsibilities with respect to that Fund to Wellington.

120. Thus, the Vanguard Funds only pay investment management fees to their sub-advisers (with the exception of the 1 basis point investment management fee that the Vanguard Morgan Growth Fund pays to Vanguard).

121. Vanguard does charge its funds a "Management and Administration" charge which is, on average, 34 basis points lower than the investment management fee HFMC charges the Hartford Funds.[5]

---

[5] Besides this Management and Administration fee, Vanguard, like HFMC, charges the Vanguard Funds an "Other Expense" charge (which in all cases, in basis points, is much smaller than the Hartford Funds' other expense charge). Similar to Defendant, Vanguard charges a fee to pay the funds' sub-advisers. However, while Defendant charges 12b-1 fees on investments into the Hartford Funds, 12b-1 fees are *not* charged on investments into the Vanguard Funds.

122. A comparison of Vanguard's "Management and Administration" fee and Defendant's investment management fee demonstrates that Defendant's investment management fee is substantially disproportionate to the services HFMC renders for such fee and could not have been the product of arm's-length bargaining.

123. The table below compares Defendant's investment management fee to Vanguard's "Management and Administration" fee for each fund listed in the first column. The fees set forth in the second column, "Defendant's Investment Management Fee," exclude that portion of the fee paid to Wellington; the amount set forth is the net fee that Defendant retains for itself.

| Hartford Fund | Defendant's Investment Management Fee in Basis Points, After Deducting The Investment Management Fees Paid to Wellington For Its Sub-Advisory Services | Comparable Vanguard Fund Which Also Uses Wellington as the Fund's Sub-Adviser | Vanguard "Management and Administrative Expenses" Fees, which are Separate and Apart From the Fees Vanguard Pays to Wellington For Its Sub-Advisory Services |
|---|---|---|---|
| Hartford Healthcare Fund (Health) | For fiscal year ended October 31, 2013: **53 bps** | Vanguard Health Care Fund (Health) | For fiscal year ended January 31, 2013: **15 bps** |
| Hartford Balanced Fund (Moderate Allocation) | For fiscal year ended October 31, 2013: **52 bps** | Vanguard Wellington Fund (Moderate Allocation) | For fiscal year ended November 30, 2012: **13 bps** |
| Hartford Growth Opportunities Fund (Large Cap Growth) | For fiscal year ended October 31, 2013: **44 bps** | Vanguard Morgan Growth Fund (Large Cap Growth) | For fiscal year ended September 30, 2012: **20 bps** |

124. In addition to paying Vanguard's "Management and Administration" fees, the Vanguard Funds also pay Wellington, in its capacity as sub-adviser to the comparable Vanguard Funds, sub-advisory fees ranging from 7 bps to 17 bps, depending on the fund.

125. In exchange for the "Management and Administration" charge for each of the Vanguard Funds, Vanguard performs "[c]orporate management and administrative services." "Corporate management and administrative services include: (1) executive staff; (2) accounting and financial; (3) legal and regulatory; (4) shareholder account maintenance; (5) monitoring and control of custodian relationships; (6) shareholder reporting; and (7) review and evaluation of advisory and other services provided to the funds by third parties."

126. HFMC's investment management fee (the portion that it does not pay to the Funds' sub-advisers) exceeds Vanguard's "Management and Administrative" fees, on average, by approximately 34 basis points. *See* Table at ¶ 123.

127. For three reasons, explained below, the services provided by Vanguard for its "Management and Administration" fee demonstrate that the portion of the investment management fee Defendant retains from the Hartford Funds is substantially disproportionate to the value of services Defendant rendered and could not have been the product of arm's-length bargaining.

### (a) Vanguard's "Management and Administration" fees Pays for the Vanguard Funds' Transfer Agent Services.

128. Transfer agent fees represent a significant portion of a fund's expenses. *See Fees and Expenses of Mutual Funds*, Investment Company Institute ("ICI") Publication, June 6, 2005.

129. According to the ICI, the services provided for transfer agent fees include "shareholder services such as basic individual shareholder account maintenance . . . ."

130. Vanguard's "Management and Administration" charge pays for, among other things, "shareholder account maintenance" and "shareholder reporting" (*i.e.*, transfer agent services).[6]

---

[6] Meaning the transfer agent fees for the Vanguard Funds are not paid through such funds "Other Expense" charge, but rather through the "Management and Administration" charge.

131. According to the ICI, transfer agent fees for mutual funds are on average equal to 15 bps. *See Fees and Expenses of Mutual Funds*, ICI Publication, June 6, 2005.

132. Vanguard is the transfer agent to the Vanguard Funds and pays for such funds' transfer agent expenses (which, as the ICI confirms are on average equal to 15 bps) through its "Management and Administration" charge, which, for the comparable Vanguard Funds, on average, such charge equals 16 bps.

133. As reflected in the table in paragraph 123, the Vanguard Health Fund, the Vanguard Wellington Fund and the Vanguard Morgan Growth Fund's "Management and Administration" fees equal 15 bps, 13 bps and 20 bps, respectively.  Meaning, that either all, or a substantial portion of, the "Management and Administration" fees that Vanguard charges the Vanguard Funds are used to pay the funds' transfer agent expenses.

134. In contrast, HFMC is not the transfer agent for the Hartford Funds.  Rather, Hartford Administrative Services Company, an affiliate of Defendant, serves as the Transfer Agent for the Hartford Funds.  Therefore, the investment management fee that Defendant charges the Hartford Funds is not used to pay the Hartford Funds' transfer agent expenses, since those services are performed by others.

135. As Exhibit A reflects, Plaintiffs pay "transfer agent fees" for investing in the Hartford Funds, which are separate, and in addition to, the investment management fees they pay Defendant.   These separate and additional "transfer agent fees" pay for the transfer agent services to the Hartford Funds.

136. The transfer agent fee for the Hartford Healthcare Fund is approximately 14 bps.  The transfer agent fee for the Hartford Balanced Fund is approximately 20 bps.  The transfer agent fee for the Hartford Growth Opportunities Fund is approximately 14 bps.

137. Accordingly, a substantial portion, if not all, of the Management and Administration" fees that Vanguard charges to the Vanguard Funds are used to pay for the funds' transfer agent expenses. By contrast, the security holders in the Hartford Funds pay Defendant's investment management fee and a separate transfer agent fee. The transfer agent fee charged to, and paid by, the Hartford Funds on average equals 16 bps, which is 1 bp higher than the industry average fee for this service.

### (b) Vanguard's Fees For Oversight And Other Services Are *De Minims*

138. The services that are paid through Vanguard's "Management and Administration" charge to the Vanguard Funds include the following: "(1) executive staff; (2) accounting and financial; (3) legal and regulatory; . . . (5) monitoring and control of custodian relationships; . . . and (7) review and evaluation of advisory and other services provided to the funds by third parties." Vanguard also pays for the funds' transfer agent services through the "Management and Administration" charge.

139. According to Sections 3(a) and (b) of the Investment Management Agreements, Defendant performs the following administrative services for the Hartford Funds for its investment management fee:

> (a)    assist in the supervision of all aspects of the Company's [Hartford Funds] operation, including the coordination of all matters relating to functions of the custodian, transfer agent or other shareholders servicing agents (if any) accountant and other parties performing services or operational functions for the Company [Hartford Funds];
>
> (b)    provide the Company [Hartford Funds] with the services of persons . . . competent to serve as officers of the Company [Hartford Funds] and to perform such administrative and clerical functions as are necessary in order to provide effective administration for the Company [Hartford Funds], including the preparation and maintenance of required reports, books and records of the Company [Hartford Funds]; . . .

140. Vanguard also assumes responsibility for "review and evaluation [i.e., supervision] of advisory and other services provided to the funds by third parties" in exchange for payment of the "Management and Administration" fee.

141. Vanguard also uses the "Management and Administration" to pay for the following services for the Vanguard Funds: legal, regulatory, accounting, financial, and transfer agent services.  In contrast, Defendant only agrees to supervise these services in exchange for its investment management fee.

142. Vanguard's "Management and Administration" fee also pays for the executive staff of the Vanguard Funds.

143. Vanguard's "Management and Administration" fee charged to the Vanguard Health Fund, the Vanguard Wellington Fund and the Vanguard Morgan Growth Fund equals 15 bps, 13 bps and 20 bps, respectively.  Further, the "Management and Administration" charge pays for the Vanguard Funds' transfer agent services, which, on average, according to the Investment Company Institute, equals 15 bps.  Defendant's investment management fee does not pay the transfer agent services needed by the Hartford Funds; rather, this service is paid for through a separate fee.

144. After Vanguard paid for the Vanguard Funds' transfer agent services (which on average cost 15 bps) through the "Management and Administration" charge, a *de minimis* amount of the "Management and Administration" fee (which on average totals 16 bps) remained to pay for the other services that are covered by this fee, which include the supervision of third-party service providers to the Vanguard Funds. Thus, supervision, therefore, only incurs a *de minimis* fee.  Defendant also claims to provide these supervisory services in exchange for payment of its investment management fee.

145. Unlike Defendant's investment management fee, Vanguard's "Management and Administration" fee not only pays for transfer agent and supervisory services, but also pays for the actual performance of the legal, accounting and financial services that are required by the Vanguard Funds.  Thus, Vanguard's "Management and Administration" fee does not merely pay for the supervision of the performance of the legal, accounting and financial services, as is the case with Defendant's investment management fee.

146. Accordingly, Vanguard provides more extensive administrative services to the Vanguard Funds than those Defendant provides to the Hartford Funds, as set forth in sections 3(a) and (b) of the Investment Management Agreements.  Moreover, Vanguard provides such services for a *de minimis* fee.

### (c) Vanguard Does Not Charge For Investment Advisory Services On Top of The Fees For the Investment Advisory Services Provided by Wellington

147. Vanguard does not allocate any of the "Management and Administration" fees charged to the Vanguard Funds to investment management services.  In fact, almost all, if not all, of Vanguard's "Management and Administration" fees are used to pay for transfer agent services.

148. While Vanguard does not receive an investment management fee from the Vanguard Funds (other than the 1 bp investment management fee it receives from the Vanguard Morgan Growth Fund), similar to Defendant, Vanguard pays the sub-advisers to the Vanguard Funds an investment management fee.

149. The sub-adviser to all of the Vanguard Funds and the Hartford Funds discussed in this section is Wellington. Vanguard pays the sub-advisers to the Vanguard Health Care Fund, the Vanguard Wellington Fund and the Vanguard Morgan Growth Fund, sub-advisory fees equal to 15 bps, 7bps and 17bps, respectively.

150. Vanguard's fees for investment management services to the Vanguard funds (zero or 1 bp in the case of the Vanguard Morgan Growth Fund) are appropriate fee comparators for the investment management fees Defendant should have charged Plaintiffs, and the other security holders of the Hartford Funds, for its investment management services.  As shown in the following table, the services provided by Wellington to the Vanguard Funds are substantially comparable to the services Wellington provides to the Hartford Funds.

| Investment Advisor | Funds | Investment Management Services Performed by Investment Advisor |
|---|---|---|
| Wellington | Hartford Funds | (a) evaluate and implement an investment program for each fund; (b) make all determinations with respect to the investment of each fund's assets; (c) arrange for the purchase and sale of investments for each fund; and (d) render regular reports to the Board of Trustees. |
| Wellington | Vanguard Funds | (a) manage the investment and reinvestment of the assets of the fund; (b) continuously review, supervise, and administer an investment program for the fund; (c) determine the securities to be purchased or sold for the fund; (d) provide the fund with records concerning Wellington's activities; and (d) render regular reports to the Board of Trustees. |

151. As the sub-advisory agreements that Wellington entered into with the Vanguard Funds are not materially different than the sub-advisory agreements Wellington entered into with the Hartford Funds, Defendant's investment management fee should have been the same, or very close to, Vanguard's investment management fee, which was zero (except for a 1 bp investment management fee for the Vanguard Morgan Growth Fund).  Thus, substantially all of the investment management fees Defendant charged the Hartford Funds were so disproportionately large that they bore no reasonable relationship to the services Defendant rendered and could not have been the product of arm's-length negotiations.

152. Had the Vanguard investment management fee schedules been applicable to the Hartford Healthcare Fund, the Hartford Balanced Fund and the Hartford Growth Opportunities Fund, those Funds would have saved millions of dollars each year.

### D. THE HARTFORD FUNDS' BOARDS OF DIRECTORS WERE NOT ACTING CONSCIENTIOUSLY IN APPROVING THE INVESTMENT MANAGEMENT AGREEMENTS

153. In *Jones*, the Supreme Court adopted a fiduciary duty standard for § 36(b) that requires both a fair outcome and good faith in the negotiation process. 130 S.Ct. at 1427. Fund directors have a fiduciary duty to mutual funds and to their shareholders (who individually have no power to negotiate such fees for the funds) to negotiate fees that are both beneficial to the mutual funds and are comparable to fees that would be negotiated at arm's length.

154. Congress has fortified fund directors' oversight responsibilities by adopting § 15(c) of the ICA, requiring directors to be adequately informed of the terms of any investment management contracts.

155. ICA § 15(c), 15 U.S.C. § 80a-15(c) requires investment advisers to furnish documents and other information so that fund directors can make informed and independent decisions when evaluating investment advisory contracts. This section also gives directors the authority to demand such information from advisers. *Id.*

156. When Hartford starts a new mutual fund, it not only contracts to provide all the services the fund needs, it also nominates and elects the members of the fund's Board (including all "independent"[7] Board members).

157. Each of the Hartford Funds is governed by a Board of Directors. The Boards of Directors for HMF and HMFII are composed of the identical 9 people, who meet and make

---

[7] "Independent" board members are those who are not "interested persons" as defined under the 1940 Act. *See* 15 U.S.C. § 80a-2(a).

decisions for all of the Hartford Funds. There are 7 "non-interested" Directors and 2 "interested" Directors. This same group of directors oversees and makes decisions for more than 90 funds in the Hartford Funds Complex.[8]

158.    The HMF and HMFII's Board of Directors are charged with the substantial supervision of the Funds. According to the SAI, the Board: "(i) provides broad supervision over the affairs of [HMF and HMFII] and the Funds and (ii) elects officers who are responsible for the day-to-day operations of the Funds and the execution of policies formulated by the Boards of Directors."

159.    The Board members are compensated for their services with a fee that consists of an annual retainer component and a meeting fee component, as well as retirement benefits. As a result of the compensation they receive, Board membership in the Hartford Funds Complex is a lucrative part-time job for the Fund Directors. For the fiscal year ending October 31, 2013, according to publicly available information, the Board members for the funds in the Hartford Funds Complex received total compensation in the following amounts:

| Lynn S. Birdsong | $228,000 |
| Dr. Robert M. Gavin | $332,500 |
| Duane E. Hill | $208,000 |
| Sandra S. Jaffee | $202,500 |
| William P. Johnston | $238,000 |
| Phillip O. Peterson | $241,500 |
| Lemma W. Senbet | $193,000 |
| Lowndes A. Smith | $230,000 |

160.    Lowndes A. Smith and James E. Davey are "interested" directors because of their affiliation with, or equity ownership, in Hartford.[9]

---

[8] All Directors of the HMF and HMFII also serve as a director for the Hartford Series Fund, Inc., and Hartford HLS Series Fund II, Inc., and as a trustee for The Hartford Alternative Strategies Fund which, as of February 28, 2014 collectively consist of more than 90 funds.

161.    Each Hartford Board, in this case the identical 9 people for more than 90 funds, has a separate and distinct fiduciary duty to each Hartford Fund to enter into serious and substantive negotiations with respect to all fees charged to the Funds.  *See* Am. Bar Ass'n, *Fund Director's Guidebook* (2d ed. 2003), at 10 ("Although there are areas of common interest among the funds, the directors must exercise their specific board responsibilities on a fund-by-fund basis.").  Correspondingly, Defendant has a reciprocal fiduciary duty to each mutual fund under its management, including each Hartford Fund, to assure that the fees it charges are reasonably related to the services provided and correspond with fees that would be charged in an arm's length negotiation.

162.    The 7 independent or "non-interested" directors are supposed to be "watchdogs" for the Funds' shareholders.  However, since the same directors are charged with the oversight of more than 90 mutual funds in the Hartford Funds Complex, regardless of the dedication, sophistication, and the individual educational and business qualifications of the independent members of the Boards of Directors of the Hartford Funds, many of whom are otherwise fully employed in demanding positions of responsibility, the amount of documentation that must be reviewed for each meeting would be daunting if the directors were to look at each fund individually.

163.    Furthermore, even if statutorily "non-interested," the Directors are in all practical respects dominated and unduly influenced by Defendant in reviewing the fees paid by the Hartford Funds and their shareholders.  The Directors' continuation in the role of an independent

---

[9] Directors who are currently employed by Hartford do not receive director compensation. James E. Davey does not receive director compensation by virtue of his current position as a Hartford executive.  Lowndes A. Smith is not currently a Hartford executive and therefore receives director compensation.

Director from year-to-year, and the compensation they earn, is at least partially dependent on the continued good will and support of Defendant.

164.   Defendant must obtain the annual approval of the Boards for the investment management fees it seeks to charge each Hartford Fund pursuant to the Investment Management Agreements.

165.   As detailed below, the Boards failed to act conscientiously by continuing to approve substantially all of the investment management fees that Defendant charged to the Hartford Funds, but did not pay to each Fund's sub-adviser. The fee-setting process undertaken by the Boards lacked the requisite integrity, care and good faith, and was therefore defective.

166.   The Boards do not hold separate meetings for each mutual fund.  Instead, upon information and belief, the Boards' practice has been to consider all funds at one time. The Boards approved the investment management fees that Defendant requested, with respect to each of the Hartford Funds, over a four-day period.  During this same four-day period, the same nine individuals that compose the Boards of the Hartford Funds also approved the investment management fees for more than 90 funds within the Hartford Funds Complex.

167.   According to each Hartford Funds' Annual Report, the information related to the Boards' discussion of the *Gartenberg* Factors is copied substantially verbatim for each Hartford Fund, and provides little supporting facts to conclude that the Boards undertook a thorough discussion of the relevant information for more than 90 funds during their four-day meeting.

168.   Truly independent boards of directors acting conscientiously would not have tolerated the investment management fees charged by Defendant, which performed limited services for such fees that were predominately supervisory in nature, if they had obtained adequate information regarding, among other things: (1) the services provided by Wellington,

and the fees Wellington charged for such services, as compared to the investment management fees that Defendant charged for its minimal services to the Funds; (2) the management fees charged and services provided by competitors with similar fund structures; (3) the economies of scale enjoyed by Defendant; and (4) the profitability of the Hartford Funds to Defendant (and how to evaluate the profitability data in light of economies of scale).

169.    The Investment Sub-Advisory Agreements, which were accessible to the Boards, reveal that Wellington rendered a substantial portion of the investment management services required for the Hartford Funds.  Thus, the Boards were not acting conscientiously when they approved investment management fees for HFMC that are greater than the fees paid to Wellington.

170.    James E. Davey, who is listed as the President of HFMC, executed the Investment Management Agreements between HFMC and the Hartford Funds on behalf of both HFMC and the Hartford Funds. This information, which was publicly available, should have been a red flag to the Boards that the terms of the Investment Management Agreements, and the compensation paid to HFMC pursuant thereto, were not the product of an arm's-length negotiation as Mr. Davey executed the agreements on behalf of both HFMC and the Harford Funds.

171.    In light of the fact that the documents which revealed that Wellington, as sub-adviser to the Hartford Funds, performed the substantial portion of the investment management services for the Funds, were publicly available, the Boards knew, or should have known, that they were approving grossly excessive investment management fees for HFMC.  The Boards therefore violated their fiduciary responsibilities when they approved the excessive investment management fees paid to Defendant.

172.     As further evidence that the Boards were not acting conscientiously when they approved the Funds' Investment Management Agreements, HIFSCO (HFMC's affiliate and predecessor as investment adviser to the Funds) has been the subject of an SEC Cease and Desist proceeding regarding its, and its affiliates', improper use of the Hartford Funds' (except for the Hartford Conservative Allocation Fund, the Hartford Inflation Plus Fund, and the Hartford Floating Rate Fund) assets.  Specifically, according to a SEC Order issued on November 8, 2006, "[f]rom at least January 2000 through December 2003 . . . [HIFSCO] made material misrepresentations and omitted to state material facts to the shareholders and Boards [of the Hartford Funds] . . . relating to their use of $51 million of Fund assets" [i.e., fees].  In connection with this fraudulent scheme, the SEC found HIFSCO liable for misrepresentations made in SEC filings.

173.     Under the November 8, 2006 SEC Order setting forth the terms of the settlement reached with HIFSCO and two other HIG subsidiaries, resolving the SEC's Division of Enforcement's investigation, HIFSCO (along with the other two HIG subsidiaries) was ordered to pay $55 million to settle charges of misrepresenting and failing to disclose to HMF and HMFII fund shareholders that fund assets were improperly used, in the form of directed brokerage commissions, to satisfy financial obligations to certain broker-dealers for the marketing and distribution of funds.  *Id.*  at 3.  The SEC found that HIFSCO's actions constituted a willful scheme of fraud or deceit, which included making misrepresentations in SEC filings.  In light of the SEC Cease-and-Desist Order, the Boards should have been especially diligent and exerted greater scrutiny in reviewing and approving any fee agreements with HIFSCO and its affiliates.  *See Siemers v. Wells Fargo*, No. C-05-04518(WHA), 2006 WL 2355411 (N.D. Cal. Aug 14, 2006) (facts outside the one-year statutory period can be used as evidence to

support plaintiffs' allegations regarding excessive investment management fees under Section 36(b) of the ICA).  A conscientious Board would not have approved large fees for an advisor who has been found to have committed fraud and deceit.

174.    For the period from December 31, 2003 to December 31, 2013, the Hartford Healthcare Fund earned an annualized return of 9.38% as compared to the Vanguard Health Care Fund, which earned 10.23%, for a net underperformance by the Hartford Healthcare Fund of 85 basis points per year.  This is the approximate difference in fees charged between these two comparable funds.  This analysis ignores any front-end sales load paid by Hartford Fund investors, which the Vanguard investors do not pay.  Amortizing this load over any time period will lower the return to investors in the Hartford Healthcare Fund even further.

175.    It was apparent, or should have been apparent, to Hartford Healthcare Fund's Board of Directors that, prior to the Board's decision to approve the Investment Management Agreement with HFMC, Vanguard's Wellington-managed health fund performed better than did Defendant's Wellington-managed health fund.

176.    The Hartford Healthcare Fund and the Vanguard Health Care Fund have the same investment philosophy, are both health funds and are both managed by Wellington.

177.    Vanguard provided no investment management services in addition to those provided by Wellington in the management of the Vanguard Health Care Fund other than to review and evaluate Wellington's services.

178.    For the Hartford Healthcare Fund, HFMC charged an investment management fee to the shareholders of this Fund that was approximately 46% greater than the investment management fee HFMC paid to Wellington.

179.     The Directors of the Hartford Healthcare Fund therefore failed to exercise a sufficient level of care and conscientiousness when they approved the Investment Management Agreements with HFMC given the fact that HFMC's claimed investment management services were considerably more expensive than Wellington's services, and Defendant's services did not result in any improved performance. In fact, the Hartford Healthcare Fund performed worse than the comparable Vanguard Health Fund, which was managed by Wellington alone.

180.     The Boards also were not acting conscientiously when they approved Defendant's breakpoints in the Investment Management Agreements, which were largely unattainable creating illusory benefits.

181.     Accordingly, the Boards did not act conscientiously and therefore breached their fiduciary duty when they approved Defendant's investment management fees. *See* ICA § 15(c), 15 U.S.C. § 80a-15(c). The Boards' lack of conscientiousness resulted in fees that are disproportionate to the value of the services rendered and therefore breach Defendant's fiduciary duty to the Funds under ICA § 36(b), 15 U.S.C. § 80a-35(b).

### E.     THE COSTS AND PROFITABILITY OF PROVIDING INVESTMENT MANAGEMENT SERVICES DID NOT JUSTIFY HFMC'S EXCESSIVE FEE

182. "[T]he 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its advisor be equivalent to 'the product of arm's-length bargaining.'" *See* Freeman & Brown Study, at 661. The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services.

183. Defendant's incremental costs of providing management services to Plaintiffs are not substantial, while the additional fees received by Defendant are unreasonable and hugely excessive given that the nature, quality, and level of the services remain the same in breach of Defendant's fiduciary duty to the Hartford Funds with respect to such compensation. On

information and belief, a review of Defendant's full costs of providing management services will demonstrate the enormous profitability to Defendant in managing the Hartford Funds.

184. The table in paragraph 92 shows the investment management fee schedule that HFMC charges to each of the Hartford Funds, as compared to the fee schedule that HFMC pays Wellington to whom HFMC delegated the core of the investment management duties.

185. While fees of less than 1% may seem inconsequential, these percentages translate into substantial fees when applied to Fund assets in the hundreds of millions, or even billions, of dollars.

186. In 2013 alone, HIFSCO was paid a total of $156,207,083 in investment management fees by the Hartford Funds. See Table ¶ 47. Of that sum, HIFSCO paid the Funds' sub-advisors $51,429,222 for sub-advisory services, retaining $104,777,861 for itself despite providing minimal additional management services that are predominately supervisory in nature to the Funds. *Id.* For the year ended October 31, 2013, HIFSCO retained investment management fees of over $300,000 for its smallest funds (while paying the sub-adviser only approximately $77,000 per year) to more than $47,500,000 for the largest funds (while paying the sub-adviser approximately $29,000,000).

187. "[F]und managers … routinely add a hefty 'premium' or 'monitoring fee' to the sub-advisers' charge. True, the sub-adviser may charge only 30 bps for its investment advice, but the manager will typically pad the bill, adding an additional twenty to thirty basis points 'premium' before passing along the advisory charge to fund shareholders." *See* John P. Freeman, Stewart L. Brown and Steve Pomerantz, *Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Test*, 61 OKLA. L. REV. 83, 117-118 (2008). Indeed, "overall fee levels for sub-advised funds are substantially higher than for funds managed in-house." *Id.* at 118. As

demonstrated above, Defendant is no different, padding the bill by more than $100 million dollars per year for providing limited investment management services that are supervisory in nature to the Hartford Funds.

188. Defendant's fees do not equal the fees charged by the Hartford Funds' sub-advisers, as suggested by Messrs. Freeman, Brown and Pomerantz.  Rather, Defendant's fees from the Funds exceed the sub-advisers' fees by more than 100% on average.

189. Despite delegating a substantial portion of its investment management duties to sub-advisers and performing minimal additional work that was predominately supervisory in nature, Defendant charged fees that were more than 100% greater on average than the investment management fees that were paid to the sub-advisers.

190. Put another way, the true cost of investment management services should correlate to the fees charged by the Hartford Funds' sub-adviser.  In fact, as an external, for-profit sub-adviser, the fees charged by Wellington to Defendant include Wellington's costs plus a reasonable profit.

191. While Wellington's fees are much smaller than Defendant's fee, Wellington still makes a profit.

192. This subcontracting arrangement led to fees that were disproportionate to value of the services actually rendered and to enormous profits to Defendant for minimal investment management work that is supervisory in nature.

193. In addition, Defendant enjoys enormous economies of scale, which translate into profits.  Defendant's advisory services do not increase since Wellington has served as the sub-adviser to most of the Hartford Funds for numerous years, and now serves as sub-adviser to all of

the Hartford Funds, which has allowed Defendant to avoid significant costs in its annual evaluation and oversight.

194. Further, the investment philosophies of each Fund have remained unchanged, which has allowed Defendant to avoid the costs of implementing new investment programs.

195. In addition, Defendant's percentage and absolute fees grow as Wellington's fee breakpoint is reached.  Defendant realizes the portion of the investment management fee paid to each sub-adviser when Wellington's fee breakpoint is reached.  Rather than passing these savings onto the Funds' investors, Defendant retains the savings for itself.  However, the true cost of Defendant's advisory services does not increase because Wellington achieves a breakpoint.  Thus, Defendant enjoys economies of scale.

196. These markups resulted in fees that are disproportionate to services rendered, and could not be the product of negotiations conducted at arm's-length and therefore constitute a breach of Defendant's fiduciary duty to the Funds with respect to the receipt of such compensation.

## COUNT I

### AGAINST DEFENDANT PURSUANT TO ICA § 36(b)
### ON BEHALF OF THE HARTFORD FUNDS

#### (Investment Management Fees)

197. The Plaintiffs repeat and re-allege each and every allegation contained in this Complaint as if fully set forth herein.

198. Defendant had a fiduciary duty to the Hartford Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made by and to Defendant.

199. The fees charged by Defendant for providing investment management services to the Hartford Funds breached Defendant's fiduciary duty to the Hartford Funds with respect to such compensation.

200. This Count is brought by Plaintiffs on behalf of the Hartford Funds against Defendant for breach of its fiduciary duty with respect to the receipt of compensation as defined by § 36(b).

201. The excessive fees received by Defendant were in breach of its fiduciary duties to the Hartford Funds with respect to such compensation.  By reason of the conduct described in this Complaint, Defendant violated § 36(b) of the ICA.

202. As a direct, proximate and foreseeable result of Defendant's breach of fiduciary duty in its role as investment adviser to the Hartford Funds and their investors, the Hartford Funds and their shareholders have sustained many millions of dollars in damages.

203. In charging and receiving inappropriate, unlawful and excessive compensation, and in failing to put the interests of the Plaintiffs, and other shareholders of the Hartford Funds ahead of its own interests, Defendant has breached and continues to breach its statutory fiduciary duty to Plaintiffs in violation of § 36(b).

204. The Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendant, up to and including, "the amount of compensation or payments received from" the Hartford Funds and earnings that would have accrued to Plaintiffs had that compensation not been paid.

205. Alternatively, the Plaintiffs seek rescission of the contracts and restitution of all the excessive fees paid pursuant thereto.  *See* ICA § 47(b), 15 U.S.C. § 80a-46(a-b).  When a violation of the ICA has occurred, a court may order that the Investment Management

Agreements between Defendant and the Hartford Funds, on behalf of the Hartford Funds, be rescinded, thereby requiring restitution of all investment management fees paid to it by the Hartford Funds from one year prior to the commencement of this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

(1) An order declaring that Defendant has violated and continues to violate ICA § 36(b) through the receipt of fees from the Hartford Funds that breach Defendant's fiduciary duty with respect to the receipt of compensation.

(2) An order preliminarily and permanently enjoining Defendant from further violations of the ICA.

(3) An order awarding compensatory damages on behalf of the Hartford Funds against Defendant, including repayment of all unlawful and/or excessive investment management fees paid to Defendant by the Hartford Funds or their security holders from one year prior to the commencement of this action through the date of the trial of this case, together with lost profits or investment returns on those fees, interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law. Plaintiffs reserve the right to seek punitive damages where applicable.

(4) An order rescinding the Investment Management Agreements between Defendant and the Hartford Funds (and/or HMF and HMFII); pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), including restitution of the excessive investment management fees paid to Defendant by the Hartford Funds from a period commencing one year prior to the commencement of this action

through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law.

(5)  Plaintiffs respectfully request a trial by jury for all issues above so triable.

(6)  Such other and further relief as may be just and proper under the circumstances.

Dated: March 11, 2014

Respectfully submitted,

**SZAFERMAN, LAKIND,
BLUMSTEIN & BLADER, P.C.**
/s/ Robert Lakind
Robert L. Lakind
Arnold C. Lakind
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08648
(609) 275-4511

**LEVY KONIGSBERG LLP**
Moshe Maimon
800 Third Avenue, 11th Floor
New York, New York 10022
 (212) 605-6200

**ZWERLING, SCHACHTER
& ZWERLING, LLP**
Robin F. Zwerling
Jeffrey C. Zwerling
Susan Salvetti
Andrew W. Robertson
41 Madison Avenue
New York, New York 10010
(212) 223-3900

*Attorneys for Plaintiffs*